IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

WEST NECK COMMUNITY
ASSOCIATION, INC.,

      Plaintiff and Counterclaim Defendant,

      v.                                                    Civil Action No. 2:22-cv-491

JBWK, LLC,

      Defendant and Counterclaim Plaintiff.

## **<u>MEMORANDUM OPINION</u>**

This matter is before the Court on the parties' renewed motions for summary judgment. As the Court explained in its first Memorandum Order, ECF No. 58, this case involves a 200-acre property in Virginia Beach, Virginia, located within a planned residential community known as West Neck (the "Property"). The Property was initially a golf course, but after encountering business problems, the golf course ceased operations, and the land was sold in foreclosure. JBWK, LLC ("JBWK") now owns the Property, while West Neck Community Association, Inc. (the "Association") is responsible for enforcing the rules governing West Neck.

The parties disagree as to the permissible use(s) of the Property as well as their rights and obligations related to the Property. These disputes hinge on the interpretation of the contract governing the parties, the Declaration of Covenants, Conditions, and Restrictions for West Neck (the "Declaration"). As explained in more detail below, the Court finds that JBWK retains the right to develop the Property, but that the Property must be used for residential, recreational, and related purposes. The Association in turn retains enforcement rights related to the use of the Property and compliance with the Declaration. Should future disagreements arise between the parties, the parties are required to comply with the dispute resolution procedures set forth in the Declaration.

Accordingly, the Court will grant in part and deny in part the Association's Renewed Motion for Summary Judgment, ECF No. 64, and will grant in part and deny in part JBWK's Renewed Motion for Summary Judgment, ECF No. 66.

## I.    BACKGROUND

### A. The Declaration

West Neck was formed and developed by Baymark Construction Corporation ("Baymark"), which initially owned all the real property located in the development. Def.'s SUF ¶ 2, ECF No. 67. As the community was developed, Baymark transferred the residential lots and homes to third parties, certain common areas to the Association, and the Property[1] to BayMark Golf, LLC ("BayMark Golf"), an affiliate of Baymark by reason of common ownership. *Id.* ¶ 3. When it formed the development, Baymark executed and recorded the Declaration, which imposes certain restrictions on all of the development. *Id.* ¶ 2; Decl. § 1.2. A copy of the Declaration is attached as Exhibit 1 to the Association's and JBWK's Memoranda in Support of their Renewed Motions for Summary Judgment. Decl., ECF Nos. 65-1, 67-1. The Declaration stated that the "Properties," which include all real property within West Neck, "shall be owned, conveyed, and used subject to all of the provisions of this Declaration, which shall run with the title to such property." Decl. § 1.2.[2] Baymark further established that the Declaration "shall have perpetual

---

[1]    The Property consists of six parcels: Tax Map Nos. (GPIN) 14938595200000 (30.86 ac.); 14936674360000 (31.16 ac.); 14936378940000 (114.26 ac.); 14935439520000 (25.73 ac.); 14937578690000 (0.80 ac.); and 14937597050000 (0.80 ac.) (the "Property"). Pl.'s Mem. Supp., Statement of Undisputed Facts ("Pl.'s SUF") ¶ 1, ECF No. 65; Def.'s Mem. Supp. & Resp., Statement of Undisputed Facts ("Def.'s SUF") ¶ 2, ECF No. 67.

[2]    The parties do not dispute that the Property is encumbered by the Declaration. *See* Compl. ¶ 2, ECF No. 22; ECF No. 48 at 2 (citing Am. Answer & Countercl. ¶ 2, ECF No. 33). JBWK does contest, however, the applicability of certain provisions in the Declaration. Def.'s Mem. Supp. & Resp., ECF No. 67.

2

duration and shall be enforceable by Declarant, the Association, any Owner, and their respective legal representatives." *Id.*

The Declaration includes a governance structure as well as a "flexible system of standards and procedures for the overall development, expansion, administration, maintenance, and preservation of West Neck as an age-restricted master planned community." Decl. Intro.; Def.'s SUF ¶ 2. Baymark was named the original "Declarant," a status that entitled it to various rights, including unilateral authority to amend the Declaration under certain circumstances, Decl. § 21.1; the right to transfer or assign "any right reserved to the Declarant," *id.* § 11.7; and consent rights over changes to the Declaration and the Properties' standards, *id.* §§ 11.6, 21. The Declaration also created the Association "comprised of all owners of real property in West Neck, to own, operate, and/or maintain various common areas and community improvements and to administer and enforce th[e] Declaration and the other Governing Documents." *Id.* § 1.1. "The Governing Documents establish, as part of the general plan of development for the Properties, a framework of affirmative and negative covenants, easements, and restrictions which govern the Properties." *Id.* § 4.1. They include the Declaration, any Recorded Supplemental Declaration, the Association's Articles of Incorporation and By-Laws, the Restrictions and Rules, the Architectural Guidelines, and the Association's Board of Directors' resolutions. *Id.* § 1.3.

BayMark Golf initially operated the Property as a golf course. Def.'s SUF ¶ 7. The Declaration explicitly recognizes that the operation of a golf course is a permissible use of a Private Amenity. Decl. Art. II (including in the definition of "Private Amenity", without limitation, "the golf course, if any, which is so located and all related and supporting facilities and improvements"). The Declaration anticipates that the Association and the operator of a Private Amenity will "cooperate to the maximum extent possible" and "reasonably assist the other in upholding the

Community-Wide Standard as it pertains to maintenance and the Architectural Guidelines." *Id.* § 17.10. And while the Private Amenity is subject to the Declaration, requiring that "[e]ach Owner . . . maintain his or her . . . Private Amenity . . . in a manner consistent with the Governing Documents, the Community-Wide Standard, and all applicable covenants," *id.* § 6.1(a), the Declaration provides that "[n]o rule or action by the Association shall interfere with the ownership, transfer, use, or operation of any Private Amenity," *id.* § 4.4(i). Relevant here, the Declaration grants the operator of a Private Amenity unique rights such as exclusive control over the rights to use the Private Amenity, *id.* § 17.2, discretion to add trees or other landscaping, *id.* § 17.3, and exemption from pruning or thinning trees or other landscaping, *id.* Finally, there is no guarantee in the Declaration that a golf course will be operated in perpetuity. *Id.* § 17.2 ("[N]o representations or warranties have been or are made . . . with regard to the continuing ownership or operation of any Private Amenity.").

The Declaration also includes two procedures for dispute resolution. First, the Association, through its Board, may impose sanctions "after notice and a hearing in accordance with the procedures set forth in Section 3.24 of the By-Laws." *Id.* § 8.4(a). Alternatively, the Association, through its Board, may seek monetary or injunctive relief after following the dispute resolution procedures outlined in Article XVI. Decl., Ex. D § 3.24(d).

**B. Foreclosure Sale and Subsequent Events**

In September 2019, the golf course ceased operations. Def.'s SUF ¶ 7. On April 28, 2020, the Property was sold at a foreclosure sale to an entity named WC Capital, LLC ("WCC"). *Id.* ¶ 8. Upon taking title, WCC leased the Property to JBWK, an affiliate by common ownership.[3] *Id.*

---

[3]    WCC and JBWK are both owned by David LaClair, who is the sole member of both limited liability companies. LaClair Aff. ¶ 2, ECF No. 67-7.

¶ 16. Thereafter, JBWK entered into an agreement with a local landscaping and nursery company for the business to plant trees on the Property for cultivation and resale. *Id.* ¶ 26.

On November 15, 2021, Baymark and Baymark Golf recorded a Deed of Assignment and Bill of Sale ("Original Assignment") assigning "all Declarant rights under the Declaration" to JBWK. *Id.* ¶ 23; Pl.'s Reply at 3, ECF No. 68. A Corrected Deed of Assignment and Bill of Sale was recorded on June 2, 2022 ("Corrected Assignment"), to change the reference to JBWK from a Virginia LLC to a New Mexico LLC. Def.'s SUF ¶ 24; ECF No. 67-14.[4]

On December 29, 2021, the Association's counsel emailed JBWK's counsel complaining about the trees planted on the Property. Pl.'s SUF ¶ 8; ECF No. 65-5. About a week later, JBWK received a letter from the Association's counsel alleging that planting "approximately 800 trees on the property" constituted a "fail[ure] to maintain [the] property in compliance with the Declaration and the Architectural Guidelines." Def.'s SUF ¶ 28; ECF No. 67-16. The letter advised that unless the violation was corrected by January 6, 2022, the Association would "institute the necessary action to cause [the] property to be brought into compliance with the governing documents." ECF No. 67-16. About a month later, the Association filed a Warrant in Debt ("First Warrant in Debt") in the General District Court for the City of Virginia Beach, Virginia.[5] Def.'s SUF ¶ 29; ECF No. 67-17. The First Warrant in Debt was nonsuited before the initial return date. Def's SUF ¶ 29.

---

[4]    In 2020, Baymark was administratively terminated by the Virginia State Corporation Commission. Def.'s SUF ¶ 20. However, Baymark's corporate existence was later reinstated by the Commission. *Id.* This rendered valid the prior actions taken by Baymark while it was administratively terminated. Va. Code Ann. § 13.1-754(C) (noting that upon a corporation's reinstatement "the corporate existence shall be deemed to have continued from the date of termination as if the termination had never occurred").

[5]    Both parties agree that the First Warrant in Debt was filed against JBWK. Def.'s SUF ¶ 29; Pl.'s Reply at 4. Although the First Warrant in Debt filed with the Court indicates that the claim was filed against WCC, not JBWK, this is not a material fact. ECF No. 67-17.

In June or July of 2022, WCC and JBWK merged, with JBWK being the surviving entity. Thereafter, the Association executed two amendments to the Declaration. Def.'s SUF ¶ 31. While the Declarant's approval is normally required to amend the Declaration, these amendments were executed unilaterally by the Association's members. *See* Decl. § 21.2; Decl. Amendments at 6, 27, ECF No. 67-19. The amendments stated that "neither [Baymark], nor any Person designated as Declarant in a recorded instrument, holds title to any portion of the property subject to the Declaration for the purpose of development and/or sale." Decl. Amendments at 6, 27.

### C. Procedural History

The Association filed a second Warrant in Debt ("Second Warrant in Debt") in the General District Court for the City of Virginia Beach, Virginia, on September 28, 2022. Not. of Removal ¶ 1, ECF No. 1. The Second Warrant in Debt requested relief of $900.00 plus interest, $64.00 in costs, and reasonable attorney's fees. *Id.* ¶ 7.

On November 2, 2022, JBWK initiated its own lawsuit by filing a complaint with this Court seeking declaratory and injunctive relief against the Association. *See JBWK, LLC v. West Neck Cmty. Ass'n*, No. 2:22-cv-466, ECF No. 1 (E.D. Va. Nov. 23, 2022). Thereafter, JBWK removed the Association's state court action to this Court. Not. of Removal ¶ 10. The parties engaged in extensive motions practice. *See, e.g.*, ECF Nos. 5, 9, 21. Ultimately, the Court consolidated the Association's removed state court action with JBWK's lawsuit and designated the Association's action as the lead case. ECF No. 28. The Association filed a Complaint, JBWK filed an Amended Answer and Counterclaim, ECF No. 33, and the Court terminated the suit initiated by JBWK.

The Court previously considered the parties' motions for summary judgment, as well as several associated motions. ECF Nos. 35, 38, 43, 45, 52. As is relevant here, the Court concluded that the Declaration granted the Association "the power to bring an enforcement action against

[JBWK].” Order at 21, ECF No. 58. The Court also found that a genuine dispute of material fact existed as to whether JBWK owned the Property, which is relevant to the rights JBWK has under the Declaration. *Id.* at 22. The Court, therefore, denied the parties' motions for summary judgment without prejudice, *id.* at 24, and ordered the parties to file renewed motions for summary judgment, ECF No. 63. Consistent with the Court's instruction, the parties each filed renewed motions for summary judgment, responses, and replies, s*ee* ECF Nos. 64–69. Having reviewed the relevant submissions, the Court concludes that a hearing is not necessary. *See* E.D. Va. Loc. Civ. R. 7(J). The Motions are therefore ripe for adjudication.

## II.    PRELIMINARY MATTERS

Before turning to the substance of the parties' motions for summary judgment, it is necessary to first address several errors throughout the relevant documents, which have unnecessarily complicated the matter.

### A. Effective Date of the Merger Agreement

The Parties disagree as to the date the Merger Agreement—in which WCC and JBWK merged, with JBWK as the surviving entity—became effective. *See* Pl.'s Reply at 5; Def.'s Mem. Supp. & Resp. at 21. This argument is complicated by discrepancies within the relevant documents. Specifically, the Articles of Merger provide that the merger will be effective upon the date the Articles of Merger are recorded with the New Mexico Secretary of State. Merger Arts. Art. VI, ECF No. 65-12. However, the Merger Agreement provides that the merger will be effective upon the issuance of a certificate of merger by the "Virginia State [Corporation] Commission." Merger Agmt. § 1.1; ECF No. 65-12. Further, the Merger Agreement provides that Virginia law will govern the merger. *Id.* § 1.6.

The Articles of Merger were recorded with the New Mexico Secretary of State on June 14, 2022. Merger Cert., ECF No. 65-12. JBWK's counsel mailed a copy of the Certificate of Merger from the New Mexico Secretary of State to the Virginia State Corporation Commission, and that entity noted the change to JBWK's status on July 21, 2022. *See* Va. State Corp. Comm'n, *Survivor/Non-Survivor Entity Details, WC Capital, LLC* [https://perma.cc/A6W6-8NDD] (last visited Feb. 11, 2025).

JBWK argues that the Merger Agreement became effective on June 14, 2022, the date the merger was recorded in New Mexico. JBWK asserts that because both WCC and JBWK are New Mexico limited liability companies, the effect of their merger is governed by New Mexico law. Def.'s Mem. Supp. & Resp. at 20. However, JBWK does not address the conflicting language contained in the Articles of Merger. The Association similarly does not directly address the inconsistency between the Merger Agreement and the Articles of Merger but contends that the merger did not become effective until it was recorded. Pl.'s Reply at 5. The Court need not resolve this dispute. The parties have not adequately briefed the issue. And while the date is relevant to understanding the parties' dispute, no material decision is dependent upon the date. Accordingly, the Court will use the later date, July 21, 2022, as the date the Merger became effective.

**B. Misnomer in the Original Assignment**

In the Original Assignment—in which Baymark transferred the Declarant rights to JBWK—JBWK is misidentified as a Virginia limited liability company. ECF No. 67-14. However, in its Statement of Undisputed Facts, JBWK is identified as a New Mexico limited liability company, Def's SUF ¶ 21, a fact not disputed by the Association, *see* Pl.'s Reply at 2–4. Nevertheless, the Association argues, without support, that the error has some effect on it as a third-party entitled to notice of the assignment. *Id.* at 6. JBWK argues that the misidentification of

8

JBWK as a Virginia limited liability company in the Original Assignment was a naming error and that "[p]roof of the parties' intention is contained in the Corrected Assignment, which corrects the misnomer." Def.'s Mem. Supp. & Resp. at 19 (cleaned up). Of note, this issue resulted in the Court concluding in its first Order that genuine disputes of material fact existed as to whether JBWK owned the Property. Order at 21.

Under Virginia law, "a misnomer in a corporate name does not invalidate a contract when it is clear what corporation the parties intended." *Marina One, Inc. v. Jones*, No. 4:13-cv-117, 2015 WL 1538226, *4 (E.D. Va. 2015) (quoting *Lataif v. Com. Indus. Const., Inc.*, 286 S.E.2d 159, 161 (Va. 1982)). Here, the Court agrees with JBWK that the misidentification of JBWK as a Virginia limited liability company was a misnomer and that JBWK's identity as a New Mexico limited liability company has been demonstrated.

The Association's arguments relating to the misnomer miss the mark. First, as JBWK correctly points out, because the Association was not a party to the Original Assignment, it lacks standing to contest the validity of the Original Assignment. *See* Def.'s Reply at 5, ECF No. 69; *see also Wells v. Shoosmith*, 428 S.E.2d 909, 913 (Va. 1993) ("Generally, one who is not in privity of contract cannot attack the validity of the contract.") (citation omitted). Second, while it is true that the correct entity needs to be identified for notice purposes, the record contains sufficient evidence of Baymark and Baymark Golf's intent to assign the Declarant rights to JBWK through the Original Assignment, ECF No. 67-14, and the Association has offered no evidence to the contrary. Accordingly, it is clear from the record that Baymark and Baymark Golf intended to transfer the declarant rights to JBWK through the Original Assignment.

### III.    LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, a party may move for summary judgment on a claim or defense, or part of a claim or defense. Fed. R. Civ. P. 56(a). The district court will "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.* A fact is material if "its existence or non-existence would affect disposition of the case under applicable law." *Wai Man Tom v. Hosp. Ventures LLC*, 980 F.3d 1027, 1037 (4th Cir. 2020) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "A genuine question of material fact exists where, after reviewing the record as a whole, a court finds that a reasonable jury could return a verdict for the nonmoving party." *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012) (citations omitted).

The movant bears the initial burden of demonstrating that there is no genuine issue of material fact. *Wai Man Tom*, 980 F.3d at 1037 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). The nonmoving party must then establish that specific material facts exist that would give rise to a genuine issue. *Id.* The party opposing the fact must rely on more than conclusory allegations, mere speculation, inference building, or the existence of a mere scintilla of evidence concerning a material fact. *Stone v. Liberty Mut. Ins.*, 105 F.3d 188, 191 (4th Cir. 1997) (citations omitted). In reaching its decision, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (citations omitted).

In reviewing cross-motions for summary judgment, the Court will consider each motion separately on its own merits to determine if either party deserves judgment as a matter of law. *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (citations omitted). In considering each motion, the Court will take care to resolve any factual disputes and "competing, rational

inferences" in the light most favorable to the opposing party. *Id.* (quoting *Wightman v. Springfield Terminal Ry. Co.*, 100 F.3d 228, 230 (1st Cir. 1996)).

## IV.    ANALYSIS

At its core, this case is a contract dispute. Under Virginia law, declarations of covenants, conditions, and restrictions, as well as other recorded instruments, are construed using the same principles as ordinary contracts. *Manchester Oaks Homeowners Ass'n v. Batt*, 732 S.E.2d 690, 697 (Va. 2012) (noting that a declaration made under the Virginia Property Owners' Association Act is "'a contract entered into by all owners' of the lots in the [development] it governs" (quoting *Sully Station II Cmty. Ass'n v. Dye*, 525 S.E.2d 555, 556 (Va. 2000))).

In construing a contract, "effect must be given to the intention of the parties." *Sully Station*, 525 S.E.2d at 556 (citation omitted). "[W]here an agreement is complete on its face, is plain and unambiguous in its terms, the court is not at liberty to search for its meaning beyond the instrument itself." *Globe Iron Const. Co. v. First Nat'l Bank of Bos.*, 140 S.E.2d 629, 633 (Va. 1965). In other words, "[t]he contract is construed as written, without adding terms that were not included by the parties." *PMA Cap. Ins. Co. v. US Airways, Inc.*, 626 S.E.2d 369, 372 (Va. 2006) (citing *Wilson v. Holyfield*, 313 S.E.2d 396, 398 (Va. 1984)). Likewise, "[w]ords that the parties used are normally given their usual, ordinary, and popular meaning. No word or clause in the contract will be treated as meaningless if a reasonable meaning can be given to it, and there is a presumption that the parties have not used words needlessly." *Id.* at 372–73 (quoting *D.C. McClain, Inc. v. Arlington Cnty.*, 452 S.E.2d 659, 662 (Va. 1995)).

The Association brings this action under the Virginia Property Owners' Association Act. Va. Code Ann. § 55.1-1800, *et seq.* The Association argues it is entitled to enforce the Declaration against JBWK for its failure to maintain the property, for erecting a fence, and for operating a commercial tree-farm, all of which the Association argues violated and continues to violate the

Declaration, Architectural Guidelines, and Community-Wide Standard. Pl.'s Mem. Supp. at 7. The Association further argues that JBWK is not the Declarant; that the 2022 Amendments to the Declaration are valid; and that JBWK is not operating the property as a Private Amenity. *Id.* at 12–16. The Association seeks (1) an injunction ordering JBWK to maintain the Property in compliance with the Declaration; and (2) an imposition of a $900 fine plus costs and attorney's fees for past noncompliance with the Declaration. Compl. ¶ 26.

JBWK counterclaims, asserting that it is the Declarant; the Association cannot challenge, protest, or object to a change in use of the Declarant's property; the 2022 Amendments are invalid; it is operating the property as a Private Amenity; it has not violated the Declaration; and the Association failed to provide JBWK with adequate notice pursuant to the Declaration and the Virginia Property Owners' Association Act. Def.'s Mem. Supp. & Resp. at 16–36. JBWK seeks (1) a determination that JBWK is the Declarant and holder of Declarant Rights under the Declaration; (2) a determination that JBWK is entitled to plant trees on the Property and otherwise use the Property as it sees fit (subject only to federal, state, and local laws and ordinances); and (3) an injunction barring the Association from entering the Property or interfering with its rights under the Declaration. Am. Answer & Countercl. at 24.

As explained in more detail below, the Court finds that no later than July 21, 2022, JBWK became the Declarant and holder of the Declarant rights under the Declaration. As a result, the Association's 2022 Amendments to the Declaration are invalid. Irrespective of JBWK's status, the Declaration limits JBWK's use of the Property and its current use of a portion of the Property as a commercial tree-farming business is an impermissible use. Finally, while the Declaration allows the Association to enforce the Declaration against JBWK, the Association failed to comply with

the process outlined in the Declaration and By-Laws for resolving disputes and is therefore not entitled to recover against JBWK.

### A. Declarant Status and the 2022 Amendments

Originally, West Neck was formed and developed by Baymark, which initially owned all the real property located in the development. Def.'s SUF ¶ 2. As such, the Declaration defines the Declarant as Baymark or "any successor or assign who takes title to any portion of the property described in Exhibits 'A' or 'B' for the purpose of development and/or sale and who is designated as Declarant in a Recorded instrument the immediately preceding Declarant executes." Decl. Art. II. The Declaration provides "[a]ny or all of Declarant's special rights and obligations set forth in [the] Declaration or the By-Laws may be transferred in whole or in part . . . provided, the transfer shall not reduce an obligation nor enlarge a right beyond that which Declarant has under this Declaration or the By-Laws." *Id.* § 11.7. However, "[n]o such transfer or assignment shall be effective unless it is in a written instrument which Declarant signs and Records." *Id.* As such, for JBWK to be the Declarant, it must have (1) taken title to some portion of property covered by the Declaration, (2) for development or sale, and (3) be designated as Declarant in a recorded instrument executed by Baymark (the "immediately preceding declarant").

### 1. WCC, then JBWK, Takes Title to the Property

WCC purchased the Property on April 28, 2020. Def.'s SUF ¶ 8. The parties do not suggest, nor is there any evidence, that Baymark relinquished its Declarant rights to WCC. Accordingly, at the time WCC purchased the Property, the Declarant rights remained with Baymark.

No later than July 2022, the merger between WCC and JBWK became effective. *See supra* Part II.A. On that date, all of WCC's "property, real and personal (tangible and intangible)" was "vested in and possessed by" JBWK, "and all property, rights, privileges, powers and franchises,

and all and every other interest, shall be thereafter the property of [JBWK]." Merger Agmt. § 1.3, ECF No. 65-12. Accordingly, no later than July 21, 2022, JBWK took title to the Property.

### 2. JBWK Takes Title to the Property for the Purpose of Development and/or Sale

In addition to taking title, the entity taking title must do so "*for the purpose of development and/or sale.*" Decl. Art. II (emphasis added). Whether JBWK took title to the Property for the purpose of development and/or sale is a material fact that is disputed by the parties.

The owner of WCC, David LaClair, testified that "WCC acquired the Property in order to sell the Property." LaClair Aff. ¶ 4, ECF No. 67-7; Def.'s SUF ¶ 16. WCC's property manager at the time, Chris Coleman, also testified that when WCC purchased the Property "it was to resell the Property, either to the Association or another third party." *See also* Coleman Aff. ¶ 25, ECF No. 67-4. ("At the time [WCC] acquired the [Property], it believed that it could obtain a quick sale of that Property—with the most likely buyer being the [Association].").

Upon discovering that a quick sale of the Property was not in the cards, WCC began to explore ways to defray costs until it could ultimately find a buyer for the Property. *Id.* ¶ 25; LaClair Aff. ¶ 5. WCC concluded that it could defray costs by leasing the Property to JBWK to conduct farming operations. Coleman Aff. ¶ 25. Thereafter, JBWK applied for and received a business license permitting it to conduct agricultural operations at the Property. *Id.* ¶ 26. JBWK then agreed to permit a local landscaping company to plant roughly 700 trees on the Property in December 2021 for cultivation and resale. *Id.* ¶ 25. The following summer, WCC and JBWK merged. LaClair Aff. ¶ 6; *see supra* Part II.A.

The Association does not dispute these facts. Nevertheless, the Association contests JBWK's undisputed facts "to the extent they imply that JBWK purchased the property for purposes of development and/or sale." Pl.'s Reply at 3. The Association argues that the evidence, especially

JBWK's business plan and license application, demonstrates that JBWK's intent with regard to the Property was to conduct agricultural activities. *Id.* The Association asserts that agricultural activities cannot be characterized as "development or sale." *Id.* at 10–12; *see also* Pl.'s Mem. Supp. at 14.

The Association's argument misses the forest for the trees. The record is clear, and the Association does not contest, that WCC purchased the property with the intent to sell it. Def.'s SUF ¶¶ 11, 16; Pl.'s Reply at 3. When WCC realized it would not be able to quickly sell the Property, it leased the Property to JBWK, an associated entity, to defray holding costs until it could ultimately find a buyer. Coleman Aff. ¶ 25; LaClair Aff. ¶ 5. Coleman testified that JBWK began functioning as "more of an operating entity when we moved toward farming the property and building a tree farm."[6] ECF No. 65-3 at 4. Moreover, JBWK's business plan and license application were prepared and filed *after* WCC determined that it needed to defray holding costs pending a sale of the Property. Def.'s SUF ¶ 16. Again, the Association does not contest these facts. WCC and JBWK merged shortly thereafter, in the Summer of 2022. Both LaClair and Coleman testified that the intent to sell the Property survived the merger. Coleman Aff. ¶ 25; LaClair Aff. ¶ 4. All of this evidence supports JBWK's position that its predecessor, WCC, intended to sell the Property when the Property was originally purchased and that intent survived the merger, with the operation of a tree farm business being solely a means to defray costs until the Property could be sold.

---

[6]     The Association also points to Coleman's testimony that JBWK is currently using some of the Property as a tree farm and for "[a]ny agricultural purpose that the city will let [it]." Pl.'s Reply at 11 (citing ECF No. 68-1 at 5). The Court finds this testimony to be irrelevant. JBWK's current use of the Property for agricultural purposes is not relevant to the inquiry of whether JBWK's intent *at the time it took title* to the Property was for the purpose of development or sale.

The Association has failed to produce sufficient evidence to allow a reasonable trier of fact to conclude that JBWK took title to the Property without the purpose of development or sale.[7] Even viewed in the light most favorable to the Association, the evidence upon which the Association relies (the business plan and license application) only provides limited evidence related to JBWK's intended purpose for the Property at the time of the merger. For a jury to conclude that JBWK intended to hold the Property in perpetuity to operate a commercial tree farm, the jury would be required to ignore uncontested facts or infer that JBWK's intended purpose for the property shifted away from ultimately selling the Property. The Association has pointed to no evidence that supports these conclusions, and the Court declines to engage in such speculation. The Association's evidence, therefore, fails to create a genuine issue of material fact to support the Association's desired conclusion. Accordingly, the Court concludes that when JBWK took title of the Property, it did so "for the purpose of development and/or sale." Decl. Art. II.

### 3. JBWK is Designated the Declarant

On November 15, 2021, Baymark and JBWK recorded the Original Assignment wherein Baymark:

> Assign[ed], transfer[ed], and convey[ed] absolutely to [JBWK] all of the Assigned Assets, including but not limited to (i) all rights associated with or with respect to the Property; (ii) all rights associated with or arising under the Agreements, including but not limited to rights arising under recorded and unrecorded easements and all Declarant rights under the Declaration; and (iii) any and all other rights arising under or related in any way to the Agreements.[8]

---

[7] The parties do not address the effect of the merger on this analysis, specifically whether the Court should consider JBWK's intent at the time WCC obtained the property (through purchase) or JBWK's intent at the time JBWK obtained the property (through merger). The Court evaluates JBWK's intent at the time of the merger, but the outcome would be the same if assessed at the earlier time.

[8] "Assigned Assets" are defined as "all rights associated with or arising under" the following "Agreements": "(i) Deeds of Conveyance pursuant to which the Seller accepted title to the real property. . .; (ii) the Declaration of Covenants, Conditions, and Restrictions for West Neck. . .; and

ECF 65-13; Def.'s SUF ¶ 23; Pl.'s Reply at 3. Later, Baymark and JBWK executed and recorded a Corrected Deed of Assignment, which included the same conveyance language quoted above.[9] Def.'s SUF ¶ 24; ECF No. 67-14 at 5–7.

The Declarant is "any successor or assign who . . . is designated as Declarant in a Recorded instrument the immediately preceding Declarant executes." Decl. Art. II. By transferring all of its rights associated with, arising under, or related in any way to the Declaration to JBWK, Baymark designated JBWK to become the Declarant under the Declaration. *See Designate*, Black's Law Dictionary (12th ed. 2024) ("To choose (someone or something) for a particular job or purpose."). The Original Assignment satisfies the requirements of the Declaration. JBWK was designated as the Declarant, and Baymark (the immediately preceding Declarant) executed the assignment.

The Association's arguments do not change this conclusion. The Association does not dispute that the Original Assignment was recorded or that Baymark executed the assignment. Rather, the Association questions the adequacy of the Original Assignment's consideration and observes that JBWK is listed as a Virginia rather than a New Mexico limited liability company. Pl.'s Reply at 4–5. The Court disagrees. The Declaration does not require consideration, and even if it did, the Association lacks standing to challenge the assignment's consideration. *Shoosmith*, 428 S.E.2d at 913. And, as explained above, the Court previously rejected the misnomer argument. *See supra* Part II.B. That leaves the issue of whether JBWK was assigned the Declarant rights.

---

(iii) Easements and other instruments of record and not of record not mentioned above. . . ." ECF No. 65-13.

[9]     When Baymark and JBWK executed the Corrected Assignment is unclear. The document states: "This corrected deed . . . is made effective as of the 15th day of November 2021." ECF No. 67-14. However, the notary block indicates Mr. Foster, on behalf of Baymark, did not sign the document until June 1, 2022. *Id.* Regardless, when the documents were executed is not relevant in this case. Rather, what is controlling is when the documents were recorded. Decl. Art. II.

Here, the Association argues that JBWK was not the Declarant because it did not own property as of that date and because the Original Assignment does not use the right language. Pl.'s Reply at 5.

The Association's first argument conflates assigning/obtaining the Declarant rights with satisfying all of the requirements to *become* the Declarant. As described above, on November 15, 2021, JBWK was properly assigned the Declarant rights consistent with the requirements of the Declaration. *See* Decl. § 11.7 (requiring the former declarant to transfer rights in an executed and recorded instrument). Owning property is not a condition or requirement to being *assigned* the Declarant rights. However, owning property is a condition or requirement to *becoming* the Declarant. *Id.* Art. II. Accordingly, the fact that JBWK did not *own* property as of the date it was assigned the Declarant's rights is irrelevant and does not change the fact that the assignment occurred.

The Association's second argument relates to the language used to effectuate the assignment of the Declarant's rights. The Association argues that JBWK has not been designated as the Declarant because "[t]here is no express designation naming JBWK the Declarant." Pl.'s Mem. Supp. at 15. In short, the Association argues that the language used in the assignment ("assign[ed], transfer[ed], and convey[ed] absolutely to [JBWK] all of the Assigned Assets, including but not limited to") was inadequate. ECF 65-13. The Court rejects this argument. Such an exacting requirement is not found in the Declaration. Additionally, in examining the Declaration, it is clear that the purpose of recording the transfer is to give notice to the parties when a shift in the Declarant occurs. This goal was accomplished when the Original Assignment was recorded in the Circuit Court of Virginia Beach. Accordingly, as of November 15, 2021, the Association was on notice that Baymark had assigned all its rights associated with or arising under the Declaration to JBWK.

For these reasons, the Court will grant summary judgment to JBWK, adjudicating that JBWK is the Declarant and holder of the Declarant rights under the Declaration, and deny summary judgment to the Association on the same issue.

### 4. The Association's August 2022 Amendments to the Declaration are Invalid

After JBWK became the Declarant in or before July 2022, the Association purported to amend the Declaration. On August 18, 2022, the Association recorded two amendments. *See* Decl. Amendments. One of the amendments sought to delete and replace entirely the definition of "Declarant" in Article II and delete Article XI and Section 21.1.[10] *Id.* at 25–27. The other sought to amend the definition of "Parcel", delete and replace the definition of "Owner" from Article II, and delete and replace Sections 6.1, 7.2, 9.5, 9.8 and Article XIV. *Id.* at 2–6. Both amendments indicate that "Voting Members representing more than 75% of the Class 'A' votes [in the Association] . . . approved this Amendment." Decl. Amendments at 6, 27.

The Court finds the Association's attempt to amend the Declaration invalid. In addition to the approval of the Voting Members, the Declaration also requires the Declarant's consent for the Declaration to be amended. *See* Decl. § 21.2. Additionally, the Declaration provides that "[n]o amendment may remove, revoke, or modify any right or privilege of Declarant . . . without the written consent of Declarant." *Id.* § 21.3. JBWK was not informed of the amendments, nor did it consent to them. Coleman Aff. ¶¶ 29–30. Accordingly, the Court will grant summary judgment to

---

[10] The Association argues that no Declarant existed at the time of the Amendments because Baymark ceased being the Declarant when it was terminated on or about November 30, 2020, and because no other entity (i.e. JBWK) was the Declarant at that time. The Court has already found the Association's second argument meritless. *Supra* Parts IV.A.1–3. With regards to the Association's first argument, the Court also finds this argument lacks merit. *See* Va Code Ann. § 13.1-754.

JBWK, adjudicating that the 2022 Amendments are invalid and unenforceable, and deny summary judgment to the Association on the same issue.

### B. The Relief Sought by the Parties

Having addressed these preliminary matters, the Court now turns to the substance of the parties' dispute. The Association seeks (1) an injunction ordering JBWK to maintain the Property in compliance with the Declaration; and (2) the imposition of a $900 fine plus costs and attorney's fees for past noncompliance with the Declaration. Compl. ¶ 26. JBWK seeks (1) a determination that JBWK is the Declarant and holder of Declarant Rights under the Declaration; (2) a determination that JBWK is entitled to plant trees on the Property and otherwise use the Property as it sees fit (subject only to federal, state, and local laws and ordinances); and (3) an injunction barring the Association from entering the Property or interfering with its rights under the Declaration. Am. Answer & Countercl. at 24. For the reasons set forth below, the Court will deny the Association's request for injunctive relief and monetary damages, grant in part JBWK's request for declaratory relief, and deny JBWK's request for injunctive relief.

A party seeking a permanent injunction must demonstrate:

(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006) (citations omitted). "An injunction should never 'be granted as a matter of course,' as it is a 'drastic and extraordinary remedy' that is only appropriate after careful balancing of all competing interests." *Vollette v. Watson*, 978 F. Supp. 2d 572, 583 (E.D. Va. 2013) (quoting *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139 (2010)). "The decision to grant or deny permanent injunctive relief is an act of equitable discretion

by the district court, reviewable on appeal for abuse of discretion." *eBay Inc.*, 388 U.S. at 391 (citations omitted).

"In a case of actual controversy within its jurisdiction," the district court "may declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201(a). "Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such." *Id.* District courts have the discretion to decide whether to hear actions that only seek a declaratory judgment. *Charter Fed. Sav. Bank v. O.T.S.*, 976 F.2d 203, 208 (4th Cir. 1992). In deciding whether to exercise this discretion, this Court must consider whether declaratory relief would "serve a useful purpose in clarifying and settling the legal relations in issue," and whether judgment would "terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." *Volvo Const. Equip. N. Am., Inc. v. CLM Equip. Co.*, 386 F.3d 581, 594 (4th Cir. 2004) (citation omitted).

### 1. The Association's Complaint

The following alleged breaches make up the Association's claim against JBWK:

JBWK failed to perform required landscaping, including mowing or otherwise taking care of the grass (weeding), and the trimming of the bushes, trees, shrubberies, and greeneries and, therefore, has failed to maintain the Property in accordance with the Declaration, Architectural Guidelines, and the Community-Wide Standard.

JBWK has erected, or allowed to be erected, an 8-foot-tall, solid metal fence across the rear property line of three owners who raised concerns about JBWK's failure to comply with the Declaration.

JBWK has established, or allowed to be established, a business and trade and otherwise planted plants on the Property without express authorization by the Board of Directors for the Association and in violation of the Declaration, Rules, and Architectural Guidelines.

Compl. ¶¶ 12–14 (cleaned up). The Association asserts that JBWK violated the Community-Wide Standard; the Architectural Guidelines outlined in Article V of the Declaration; and failed to

21

maintain the Property per Article VI of the Declaration (including the Rules and Restrictions). *Id.* The Association further alleges that the above alleged "violations have not been corrected and . . . remain on the [P]roperty." *Id.* ¶ 19. The Association cites Section 8.4 of the Declaration and the Virginia Property Owners' Association Act as the authority for bringing this suit and its alleged entitlement to attorney's fees and costs. *Id.* ¶¶ 24–25.

JBWK responds that the Association has failed to include sufficient facts to support these claims and previously failed to send the requisite notice under Section 3.24 of the By-Laws and to comply with the alternative dispute resolution procedures outlined in Article XVI of the Declaration. Def.'s Mem. Supp. & Resp. at 32–36. The Court agrees with JBWK.

*a. The Association has the power to enforce the Declaration against JBWK*

As this Court previously determined, the Declaration permits the Association to bring an enforcement action against JBWK. *See* Order at 21–22. The Declaration's stated "Purpose and Intent," as well as the language of the Declaration, make this clear. The Declaration "provides a flexible and reasonable procedure for West Neck's future expansion . . . and provides for its overall development, administration, maintenance, and preservation." Decl. § 1.1. The creation of the Association was "[a]n integral part of the development plan" and was established, among other reasons, to "administer and enforce th[e] Declaration and the other Governing Documents." *Id.* Moreover, the Declaration expressly provides that it "shall be enforceable by Declarant, the Association, any Owner, and their respective legal representatives." *Id.* § 1.2.

Despite this finding, JBWK argues that the Association's power to object to changes to the Property is limited by the Declaration. Def.'s Reply at 19. Section 11.3, which addresses the Declarant's right to develop, states that "[e]very Person that acquires any interest in the Properties . . . agrees not to protest, challenge, or otherwise object" to changes in use or density or changes

22

to the Master Plan unless the changes relate to property within the Neighborhood in which that person holds an interest. *Id.* § 11.3. JBWK argues that the Association does not hold an interest in the Property and, therefore, has no right to object to such changes. *See* Def. Mem. Supp. & Resp. at 26–27. The Association disagrees. *See* Pl.'s Reply at 13–14.

The Court need not resolve this dispute. Contrary to JBWK's argument, even if the provision is applicable (an issue the Court does not reach), the provision does not *limit* the Association's power to enforce the Declaration. Such a reading would be inconsistent with the Declaration as a whole, in which the Association was created "to administer and enforce th[e] Declaration and the other Governing Documents referenced in th[e] Declaration." Decl. § 1.1. On the other hand, if the provision is applicable, it does not substantially *broaden* the Association's rights. As described above, the Association already possesses the right to enforce the Declaration, which is substantively similar to the right to protest, challenge, or otherwise object. Owing to this, the application of this section would neither limit nor expand the Association's enforcement rights. For these reasons, the Court will deny JBWK summary judgment that the Declaration prohibits the Association from objecting to a change in use of the Property.

### b. The Association failed to comply with the Declaration or By-Laws

While the Association has the power to enforce the Declaration, its ability to do so is not unlimited. Rather, certain rules and procedures must be followed before the Association, through its Board, can enforce the Declaration. The Association has two options. First, the Association may "impose sanctions for violations of the [Declaration] after notice and a hearing in accordance with the procedures set forth in Section 3.24 of the By-Laws." *Id.* § 8.4(a), Decl., Ex. D. § 3.24 (the "By-Law Procedures"). Alternatively, if seeking to enjoin a violation of the Declaration or recover monetary damages, the Association may proceed under Article XVI of the Declaration but must comply with the dispute resolution procedures outlined in that article (the "Dispute

Resolution Procedures"). *Id.* § 8.4(a); Decl., Ex. D §3.24(d). The Association failed to comply with either procedure.

### i. The By-Law Procedures

Section 3.24 of the By-Laws grants the Association "the power . . . to impose sanctions for any violation of the Governing Documents." Decl., Ex. D § 3.24. However, before imposing sanctions, the Association must comply with the By-Laws Procedures, beginning with providing written notice. *Id.* § 3.24(a). That notice must describe:

> (i) the nature of the alleged violation, (ii) the proposed sanction to be imposed, (iii) a period of not less than 10 days within which the alleged violator may present a written request for a hearing to the Board or the Covenants Committee, if one has been appointed pursuant to Article V; and (iv) a statement that the proposed sanction shall be imposed as contained in the notice unless a challenge is begun within 10 days of the notice.

*Id.* After receiving notice, the alleged violator has the right to request a hearing. *Id.* § 3.24(b). If a hearing is requested, the Board "shall provide at least 14 days' prior written notice to the alleged violator of the date, time, and location of the hearing." *Id.* The Board must thereafter provide the alleged violator "[w]ritten notice of the decision reached and the sanction imposed." *Id.* Critically, the Board is only entitled to sanctions if it complies with the By-Laws Procedures. *Id.* § 3.24.

### ii. The Dispute Resolution Procedures

Alternatively, the Association may, "following compliance with the dispute resolution procedures set forth in Article XVI of the Declaration," proceed "by suit at law or in equity to enjoin any violation or to recover monetary damages or both." *Id.* § 3.24(d). The Dispute Resolution Procedures set forth the requirement that "each Bound Party[11] agrees not to file suit in

---

[11]    Bound Parties are defined as "Declarant, the Association and its officers, directors, and committee members, all Persons subject to this Declaration, and any Person not otherwise subject to this Declaration who agrees to submit to this Article." Decl. § 16.1(a).

any court . . . unless and until it has first submitted such Claim to the alternative dispute resolution procedures set forth in Section 16.2 in a good faith effort to resolve such Claim." Decl. § 16.1(a).

The Dispute Resolution Procedures contain three phases: Notice, Negotiation, and Mediation. *Id.* § 16.2. In phase one, the party asserting a claim must give written notice to the Board and the party against whom the claim is being asserted. *Id.* § 16.2(a). That written notice must include: "(i) the nature of the Claim; (ii) the legal basis of the Claim; (iii) the Claimant's proposed resolution or remedy; and (iv) the Claimant's desire to meet with the Respondent to discuss in good faith ways to resolve the claim." *Id.* (cleaned up). In phase two, the parties are expected to "make every reasonable effort to meet in person and confer for the purpose of resolving the Claim by good faith negotiation." *Id.* § 16.2(b). If no resolution is reached within 30 days of phase one, phase three requires the Claimant to submit the Claim to mediation no more than 30 days later. *Id.* § 16.2(c). Importantly, "[i]f the Claimant does not submit the Claim to mediation within such time, . . . the Claimant shall be deemed to have waived the Claim, and the Respondent shall be relieved of any and all liability to the Claimant . . . on account of such Claim." *Id.*

### *iii. The Association failed to comply with the Required Procedures*

#### *aa. The First Warrant in Debt*

On December 29, 2021, the Association's counsel sent an email notifying JBWK that it "learned about the 800 new trees planted on the 10th fairway." Pl.'s SUF ¶ 8; ECF No. 65-5. The Association notified JBWK that "[a] more formal violation letter is forthcoming." ECF No. 65-5. About a week later, JBWK received the promised violation letter. Def.'s SUF ¶ 28; ECF No. 67-16. In that letter, the Association notified JBWK that planting "approximately 800 trees on the property" constituted a "fail[ure] to maintain [the] property in compliance with the Declaration and the Architectural Guidelines." Def.'s SUF ¶ 28; ECF No. 67-16. The letter advised that unless the violation was corrected by January 6, 2022, the Association would "institute the necessary

action to cause [the] property to be brought into compliance with the governing documents." ECF No. 67-16. Approximately a month later, the Association filed the First Warrant in Debt.[12] Def.'s SUF ¶ 29; ECF No. 67-17. Given that the Association sought to recover monetary damages from JBWK, the Association was required to comply with the By-Laws Procedures or the Dispute Resolution Procedures *before* filing the First Warrant in Debt. Decl., Ex. D, § 3.24. The Association failed to comply with either.

The email and letter the Association sent JBWK do not provide adequate notice under either the By-Laws Procedures or the Dispute Resolution Procedures. *See e.g.*, *id.*; Decl. § 16.2(a). A review of the email and letter suggests that the Association's "claim" against JBWK in its First Warrant in Debt was based upon JBWK's planting of trees on the Property. A later email (sent after the First Warrant in Debt was filed) described the basis of the claim as a "failure to abide by the Declaration with respect to the landscaping and the fence (architectural controls)." ECF No. 67-18. Even assuming JBWK had notice of each of these complaints, that notice is insufficient. The Association's notice was inadequate under the By-Laws Procedures because the communications fail to advise JBWK of its right to present a written request for a hearing and fail to inform JBWK that the proposed sanction would be imposed unless a challenge was made within 10 days. Decl., Ex. D, § 3.24(a). The notice was also inadequate under the Dispute Resolution Procedures. Like above, the notice failed to state the legal basis of the Claim, the Association's proposed resolution or remedy, or the Association's desire to meet with JBWK to discuss in good faith a way to resolve the Claim. Decl. § 16.2(a).

---

[12]    The filing of a Warrant in Debt initiates a civil legal proceeding to recover a debt or seek compensation for money damages.

### *bb. The Second Warrant in Debt/The Complaint*

The Association non-suited the First Warrant in Debt before the initial return date. Def.'s SUF ¶ 29. However, this did not end the turmoil between the parties. In the summer of 2022, tensions sparked again when the Association was notified that an additional 7,000 to 10,000 trees were to be planted on the Property. Order at 6. There were also disputes over who owned the Property following the merger of JBWK and WCC and the validity of the Amendments to the Declaration. *Id.* at 6–7. In the fall of 2022, JBWK requested that the Association submit their dispute to mediation or waive the mediation requirements under the Declaration. *Id.* at 7. The parties agreed to a tentative mediation date in October. *Id.* However, before the tentative mediation date, the Association filed the Second Warrant in Debt, which served as the basis for the Complaint filed here. *See* ECF Nos. 1, 22. Importantly, the Complaint here asserts three breaches: failure to landscape, erection of the fence, and operation of a business. In its Complaint, the Association seeks both injunctive relief and recovery of monetary damages. ECF No. 22. Therefore, *before* filing the Second Warrant in Debt, the Association was required to comply with the By-Laws Procedures or the Dispute Resolution Procedures. Decl., Ex. D, § 3.24.

Before filing the Second Warrant in Debt, the Association again failed to provide JBWK with adequate notice under either procedure. In fact, the Association appears to have provided *no additional notice* other than the communications previously sent relating to the filing of the First Warrant in Debt. While it is fair to assume, based on correspondence between the attorneys for the parties, that JBWK was aware that the Association was upset with JBWK's planting of trees, landscaping, and fence, this awareness does not constitute adequate notice under either the By-Law Procedures or the Dispute Resolution Procedures. And importantly, the Association's claim relating to the operation of a business appears to have first been raised in the filing of its Complaint.

Finally, even if notice was proper (which the Court finds it was not), the Association has provided no evidence that before filing the Second Warrant in Debt the Association engaged in good faith negotiations or submitted the claim to mediation.

Accordingly, the Court finds that the Association failed to comply with the By-Law Procedures and is therefore not entitled to monetary sanctions against JBWK. The Court additionally finds that the Association failed to comply with the Dispute Resolution Procedures and has, therefore, waived the claims asserted in its Complaint. Consequently, the Court will deny summary judgment to the Association on the allegations set forth in its Complaint and will grant JBWK summary judgment that the Association failed to provide notice as required. For the same reasons, the Court will deny the Association's request for injunctive relief and monetary damages detailed in its Complaint.

### 2. JBWK's Counterclaim

JBWK seeks injunctive and declaratory relief. Am. Answer & Countercl. at 21–24. As to declaratory relief, JBWK seeks a declaration that: (1) JBWK is the Declarant and holder of the Declarant rights under the Declaration; (2) the 2022 Amendments are invalid; (3) neither JBWK nor the Property is subject to any enforcement action brought by the Association; and (4) that JBWK is entitled to plant trees and otherwise use the Property subject only to federal, state, and local laws and ordinances. The Court finds that determining these issues would both "clarify[] and settl[e] the legal relations in issue," and provide "relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." *Volvo*, 386 F.3d at 594 (citation omitted). Therefore, the Court finds that declaratory relief is warranted here. Concerning JBWK's request for an injunction preventing the Association from entering the Property or further

28

interfering with its rights under the Declaration, the Court finds that JBWK has failed to show that it is entitled to such a drastic and extraordinary remedy.

The Court has addressed the majority of the relief JBWK seeks above. The Court determined that JBWK is the Declarant, *see supra* Parts IV.A.1–3; that the 2022 Amendments to the Declaration are invalid, *supra* Part IV.A.4; and that the Association may bring an enforcement action against JBWK, irrespective of its status as the Declarant or operator of a Private Amenity, if its use or operation of the Property violates the Declaration, *supra* Part IV.B.1. The Court will therefore grant JBWK declaratory relief on the first and second issues but deny declaratory relief on the third. Accordingly, the remaining issue on which JBWK seeks declaratory relief relates to any limitations JBWK may have on its use of the Property going forward. To address this issue, the Court must consider not only the restrictions and limitations the Declaration imposes on the Property but also the rights, privileges, and obligations of JBWK as both the Declarant and operator of a Private Amenity. The Court will address each in turn.

*a. The Restrictions and Limitations on the Property*

The most basic limitation placed on the Property, and in fact on all of the Properties, is that it is subject to the Initial Restrictions and Rules. Decl. §§ 1.2–1.3 ("All property described in Exhibit 'A' and any additional property which is made a part of West Neck . . . shall be owned, conveyed, and used subject to all provisions of this Declaration, which shall run with the title of such property."); Decl., Ex. C. These guidelines make clear that all Properties "shall be used only for residential, recreational, and related purposes." Decl., Ex. C. ¶ 1. Because of this, the Declaration grants neither the Declarant nor the operator of a Private Amenity *carte blanche* to do whatever they please with the Property they own. Instead, the Declaration requires that all Properties, including the Property here, be used for residential, recreational, or related purposes.

In addition to the above "general" restriction, the Restrictions and Rules include a list of more specific "Restricted Activities." The list of Restricted Activities is not a model of clarity in that some restrictions appear to apply only to Units (i.e. single-family residences)[13] while other restrictions explicitly apply to all "Properties" or reference the Declarant. The Association argues that all of the Restricted Activities apply to the operator of a Private Amenity as well as the Declarant, except in limited circumstances. Pl.'s Mem. Supp. at 11–12. The Court rejects that argument for two reasons. First, the language of certain provisions within the Restricted Activities makes clear that they are intended to apply only to Owners of Units.[14] But further, interpreting the Restricted Activities as broadly as the Association suggests would result in conflicts with other provisions of the Declaration or produce absurd results.[15] Although the Court rejects the Association's interpretation, the Court declines to review each restriction to determine whether it applies to Units, the Properties, the Declarant, and/or the operator of a Private Amenity. The parties have not briefed this issue, and many of the restrictions may never be at issue.

---

[13]    There is much disagreement between the parties concerning the definition of a Unit and how that definition impacts the interpretation of other provisions within the Declaration. *See* Pl.'s Reply at 11–12; *see also* Def.'s Reply at 18–19. The Court has implicitly rejected some of these arguments elsewhere in this Memorandum Opinion. To the extent these arguments implicate the reach of the Restrictions and Rules, the Court finds that a "Unit" is "[a] portion of the Properties, whether improved or unimproved, which . . . is intended for development, use, and occupancy as an attached or detached residence for a single family." Decl. Art. II.

[14]    *See, e.g.*, Decl., Ex. C, ¶¶ 2(c) (restricting "[a]ny activity which emits foul or obnoxious odors outside the Unit or creates noise or other conditions which tend to disturb the peace or threaten the safety of the occupants of other Units"), 2(o) (restricting the "[u]se of any Unit for operation of a timesharing, fractionsharing, or similar program").

[15]    One Restricted Activity prohibits "[a]ny business [or] trade." Decl., Ex. C ¶ 2(r). Yet, the Declaration clearly contemplates that the Private Amenity will operate as a business. *See, e.g.*, Decl. §§ 17.1, 17.2 (discussing various forms of operation), 17.4 (referencing employees and agents), 17.5 (same), 17.6 (discussing functions). The Association's interpretation would place these provisions in direct conflict.

These questions do not, however, bring into question the fundamental requirement that the Properties are to be used only for residential, recreational, and related purposes. Such a conclusion is required from the plain language of the Declaration and Baymark's intent to establish an age-restricted master planned community. Decl. Intro. The Properties are also generally subject to the other Restricted Activities, to the extent that the individual restrictions are applicable. Here, JBWK is currently operating a commercial tree-farming business on the Property. Def.'s SUF ¶ 26. Even if such use did not conflict with one of the Restricted Activities (an issue this Court need not reach), the Property is not being used for a residential, recreational, or related purpose. On that basis, JBWK's use of the Property violates the Restrictions and Rules. Therefore, the Court will grant the Association summary judgment, adjudicating that JBWK's current use of this portion of the Property violates the Declaration, and will deny summary judgment to JBWK on the same issue.

*b. JBWK's Rights and Obligations as the Operator of a Private Amenity*

A Private Amenity is a property that is "privately owned and operated by Persons other than the Association for *recreational and related purposes*, on a club membership basis or otherwise." Decl. Art. II (emphasis added). This language makes clear that the Property, if operated as a Private Amenity,[16] must be operated "for recreational and related purposes." The language does not require the Private Amenity to be operated as a golf course specifically, only that it be used for a particular purpose, that of recreational and related uses.

---

[16] JBWK is not required, however, to operate the Property as a Private Amenity. *Id*. § 17.2 ("no representations or warranties . . . are made . . . with regard to the continuing ownership or operation of any Private Amenity"). JBWK is also permitted to sell all or part of the Property or change the ownership or operation of the Property. *Id.*

Assuming JBWK is operating a portion of the Property as a Private Amenity,[17] the Court will address JBWK's rights and obligations as the operator of such. Subject to the overarching restriction that the Property (like all Properties) must be used for a residential, recreational, or related purpose, the Declaration grants JBWK broad rights as the operator of a Private Amenity, Decl. Art. XVII, and restricts the Association from imposing a rule or taking any action that interferes with the ownership, transfer, use, or operation of such, *id.* § 4.4(i).

For example, as the operator of a Private Amenity, JBWK has the exclusive right to control the use of and access to the Property. The Declaration specifically provides that "membership in the Association . . . shall [not] confer any ownership interest in or right to use any Private Amenity." *Id.* § 17.1. Additionally, the Declaration provides:

> Rights to use the Private Amenities will be granted only to such persons, and on such terms and conditions, as may be determined from time to time by the respective owners of the Private Amenities. The owners of the Private Amenities shall have the right, . . . in their sole and absolute discretion and without notice, to amend or waive the terms and conditions of use of their respective Private Amenities, including, without limitation, eligibility for and duration of use rights, categories of use and extent of use privileges, and number of users, and shall also have the right to reserve use rights and to terminate use rights altogether, subject to the terms of any written agreements with their respective members.

*Id.* Accordingly, JBWK, in its sole and absolute discretion, controls who is permitted to use the Property and to what extent, and can terminate those rights, without notice.

Additionally, as the operator of a Private Amenity, JBWK is not required "to prune or thin trees or other landscaping" and may "in their sole and absolute discretion . . . add trees and other

---

[17]    In addition to the tree farm, JBWK appears to also be leasing the existing clubhouse to a special events and catering business and allowing some residents to exercise on the property, Def.'s Mem. Supp. & Resp. at 32, so long as "they would report trespassers and keep an eye on the Property for signs of damage." Def.'s SUF ¶ 19. The Association argues that these additional uses of the Property are also not for recreational or related purposes. Pl.'s Mem. Supp. at 15–16. JBWK counters that both uses constitute a recreational or related purpose. Def.'s Mem. Supp. & Resp. at 32. The Court will not wade into this dispute. The parties have not sufficiently briefed the issue and have failed to provide any factual support for their arguments.

landscaping to the Private Amenities from time to time." *Id.* § 17.3. The Declaration does, however, restrict this right to a certain extent. The Declaration requires that "[e]ach Owner shall maintain his or her . . . Private Amenity, and all landscaping and improvements comprising the . . . Private Amenity in a manner consistent with the Governing Documents, the Community-Wide Standard, and all applicable covenants." *Id.* § 6.1(a). Therefore, the Court will grant in part JBWK summary judgment seeking a declaration that it is entitled to plant trees on the Property so long as that activity is consistent with the Governing Documents, Community-Wide Standard, and all applicable covenants.[18]

### c. JBWK's Rights and Obligations Concerning the Property as the Declarant

To understand the Declarant's rights, a bit of context is needed. As explained above, West Neck was established as an age-restricted master planned community. *Id.* Intro. As such, as part of developing the community, Baymark encumbered all Properties—even those owned by Baymark—with certain restrictions. *See id.* § 1.2 (restrictions "run with the title" to all Properties); Decl., Ex. C ¶ 1 (requiring that the Properties "shall be used only for residential, recreational, and related purposes"). With this foundation, the Declaration set forth "a flexible system of standards and procedures for the overall *development, expansion, administration, maintenance, and preservation* of West Neck." *Id.* Intro. (emphasis added). Under these procedures, the Declarant retains broad rights, especially during the development stages. *See, e.g., id.* Art. XI (outlining additional rights reserved specifically to the Declarant), Art. XXI (detailing specific rights and

---

[18]    The Court was not provided a copy of the Community-Wide Standard, and JBWK avers it has never received a copy either. *See* Def.'s Mem. Supp. & Resp. at 32–33. JBWK speculates the reason for this is because the Community-Wide Standard does not apply to a Private Amenity, but rather "is limited in its terms to homeowners or residents of West Neck." *Id.* at 33. The Court does not reach that argument, but notes that, if applicable, the operator of a Private Amenity can only comply with the standard if it is provided a copy.

protections afforded the Declarant in the case of amending the Declaration). However, as the community develops, some of the Declarant's rights either cede to the Association, *see* § 5.2 (noting that Declarant's rights under this section may expire or terminate, and in that circumstance, the Association assumes jurisdiction over architectural matters), or degrade over time, *see e.g.*, §§ 11.1, 11.11 (termination of Declarant rights after 40 years), 10.1 (limiting Declarant's right to annex property or amend the Declaration once certain conditions are met or the passage of 20 years). Ultimately, it is the Association that is tasked with administering and enforcing the Declaration, thereby vesting the Association with broad authority and control. The Declaration is, in short, a "perpetual" document drafted to reflect the evolution of West Neck and the shifting roles of both the Declarant and the Association.

With this in mind, it is clear the Declaration gives the Declarant the right to develop the Properties, including the Property here, and prohibits the Association from unreasonably impeding this right. *Id.* § 4.4(h). The Declaration also exempts the Declarant from the architectural and landscaping guidelines, including architectural approval, further bolstering its right to develop.[19] *Id.* § 5.1. This right to develop is defined to include a change in use or a change in the Master Plan. *See id.*, *see also id.* §§ 4.4(h), 11.3. But again, even the right to develop is restricted, most notably by the requirement that the Property must be used *only* for residential, recreational, and related purposes and must otherwise comply with the Declaration. *See supra* Part IV.B.2.a. For this reason, the Court will deny JBWK a declaration that it is entitled to use the Property subject only to federal, state, and local laws and ordinances.

---

[19]    These guidelines include—and therefore exempt the Declarant from complying with any restrictions related to—any "improvements or other work (including . . . erecting or modifying fences[] or planting or removal of landscaping)." *Id.* § 5.1.

*d. Injunctive Relief is Not Appropriate*

JBWK also seeks injunctive relief "enjoining the Association from entering onto JBWK's Property or further interfering with its rights under the Declaration." Am. Answer & Countercl. at 24. JBWK has not demonstrated that it has suffered an irreparable injury for which the law will not afford an adequate remedy. *See eBay Inc.*, 388 U.S. at 391. In fact, outside of the allegations in its Counterclaim, JBWK presents no argument to support its claim for injunctive relief. *See* Am. Answer & Countercl.; Def.'s Mem. Supp. & Resp. Because JBWK has failed to demonstrate that it is entitled to injunctive relief, the Court will deny JBWK's request.

## V.   CONCLUSION

The above analysis does not address every right and obligation of the Association or JBWK. The Declaration is a complicated document with numerous interrelated and evolving rights and obligations. Many of the provisions may never be placed in issue by the parties, and the Court must "guard against [the] rendering of an opinion 'advising what the law would be upon a hypothetical state of facts.'" *Trustgard Ins. Co. v. Collins*, 942 F.3d 195, 200 (4th Cir. 2019) (quoting *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 126 (2007)). Nevertheless, as the parties navigate their ongoing relationship, the Declaration provides a framework through which the parties are to work in a manner that efficiently serves the interests of the community as a whole. If either party believes the other has violated the Declaration, it must comply with the dispute resolution procedures outlined in the Declaration. Decl., Ex. D § 3.24; Decl. Art. XVI.

For the reasons stated above, the Court will grant in part and deny in part the Association's Motion for Summary Judgment and will grant in part and deny in part JBWK's Motion for Summary Judgment. An appropriate order shall issue.

Norfolk, Virginia
Date: <u>March 31, 2025</u>

/s/

Elizabeth W. Hanes
United States District Judge

35